My name is Paul Gill. I represent Appellant Anthony Peters in this appeal. There is no question under the law that what starts as a consensual encounter between police and a citizen can develop into a Fourth Amendment seizure that is unlawful, absent reasonable articulable suspicion of wrongdoing. If the circumstances would indicate to a reasonable person that he was not free to leave. I ask you this, Mr. Gill. As to that memorandum of understanding, is that what gives the police their authority to do their patrolling in that area? Or is there something inherent other than the agreement? Judge, I think the answer is yes, that gives them that authority. I don't think that necessarily trumps state law on what constitutes a trespass, things like that. But that is certainly something that informs their ability. Let me ask you about the extent of that. It appears that this encounter occurred on sidewalk. Is that sidewalk part of the housing authority's property or is that public property? Well, Judge, I think that's an interesting question for two reasons with respect to sort of the notice of the sort of trespass notice that has to be required and what the record reflects here. Judge Hudson at Joint Appendix page 117, I believe it is, specifically asks of Officer Butler, the lead officer in this case. Are there any signs along the walkways or roadways that place any restrictions on people being in the area? Officer Butler responds, no, there are no signs, no, sir. And in fact, if one looks at especially the first, I would say maybe minute, 30 seconds to a minute of the video, which is the body wear camera video that is relied upon by the district court is on the chest of Officer Cooper. And as that pans around, one can see the front sides and backs of a lot of different buildings at the complex, and there's no indication of any signs on there. I think Judge Hudson was concerned enough about that issue to, again, because the video was played during the hearing, to ask specifically the question. And again, the answer of the officer is there were no signs on the sidewalk, which is where the defendant was seen, or elsewhere, really. He doesn't describe actually seeing that there are still notice signs up there. Well, the trespassing we're talking about in this case is trespassing once vanished, right? That seems to be the implication of his repeatedly saying you are barred. Yes, sir. Again, as far as when this occurred, I would submit there's a seizure long before officers do physically grab Mr. Peters, take him down, search him, and find the firearm on this person that leads to this case. For talking purposes, I would say if one just looks at the first 90 seconds, clearly that reflects a seizure taking place. What happens in that time is that officers are closely flanking. Again, I think both the testimony and the indication from the video are that essentially the defendant is at one part of a triangle. The officers are at two other points on the triangle and are within about five, six feet, I think is what some of the testimony says. And again, it's consistent with what's on the video. In addition, there is about maybe 15, 20 feet behind Mr. Peters a building from Creighton Court, and he is actually standing near the end of a ramp with a handrail leading down toward the sidewalk where Officer Butler is. In those first 90 seconds, he's accused five different times of criminal trespass. He is threatened with arrest for trespass. He is asked or commanded at least eight times by voice or gesture. When I say gesture, there is actually one point later on where Officer Butler makes this sort of lifting one shirt motion, and he makes it like six, seven times in a row. The officers are doing nothing to further their investigation of trespass. And again, they are in a development where even the court recognizes there seem to be no signs visible or no signs indicating sidewalks and roadways are part of the trespass ban. Judge, there's obviously a lot of case law about how words alone may be sufficient to convert a voluntary stop into a seizure. That includes the Richardson case from the Sixth Circuit, which was cited favorably by this court in the Jones decision. In Jones, one of the things that the court found important in Jones has some application here. In Jones, the defendant himself described the situation as it wasn't like the officers were saying, hey, how are you doing? It was lift your shirt. Can I pat you down from the very beginning? And again, that's consistent with this record, both in the first 90 seconds and for about another 90 seconds or more before the leading to the physical seizure. Black and Weaver are decisions from this court cited in my brief that kind of go over more broadly the kind of factors that go into this Mendenhall seizure equation. They include the number of officers. Of course, there were two here. Whether they were uniformed or not, they were both uniformed. Whether they were weapons involved, both officers were armed, but the firearms were holstered. I will say, if one views that first 90 seconds or continuing on, Officer Butler, who is the officer visible, obviously, from Officer Cooper's camera, Officer Butler does spend a lot of time with his hands sort of on his belt, which is pretty close to what I've certainly heard in many cases described as sort of a ready position on the firearm. But he doesn't unstrap it. He doesn't actually retrieve it during this encounter. The Butler-Weaver factors also include any attempt to physically block departure. There is certainly not a more definitive act like blocking in a car on a roadway. That doesn't exist here. But, again, as described, he is flanked by two officers who are very close to him. And on either side, there is a building right behind him, Officer Butler just off to his right, as well as the guardrail leading up the ramp to that building. And then, of course, when it does come to language, it's not simply the words that are used, but it is how often they are used and the language or vocal tone suggesting compliance might be compelled. I think the best description I can give to much of the wording, I can't add to the wording that one hears on the video or sees on the video, but is that it is both persistent and, frankly, presumptuous and a little mocking at times. Of course, there are accusations that he is barred and arrestable. There is a very strange moment where, and, again, the officer spoke about this a little later, but he engages in what he describes as a bucking maneuver, just sharply jumping forward as if he is going to go to word and do something to Mr. Peters. And Mr. Peters does not react other than with some sense of amazement. He goes, what are you jumping out at me for? What are you doing? The officers, of course, the way they're saying things, they're saying, just lift it all the way, man. Hey, man, just do it. So you're fine if he pats you down. So it shouldn't be a problem. So, again, this is just like Freddie Jones said in the Jones, as quoted in the Jones decision. This is not a sort of routine police encounter. It is from the beginning. You're barred, you're trespassing, you're this, you're that. From the very beginning, it is not in the nature of a routine conversation. It is a seizure. And then with respect to whether reasonable, articulable suspicion of wrongdoing existed, the government's brief at page 19 sets forth several rationales. I'm happy to go over each one of those individually. I will say as a general rule, I don't think any case cited by the government has articulated that any of those factors standing alone is sufficient for reasonable suspicion. I don't think that a case exists that really has this particular set of facts and says, well, alone, these factors are not enough, but in toto, these are. Addressing them, if I may, one by one, there's one reference by the government to my client's presence on the sidewalk with a gentleman named Garrison, whom Officer Butler said was also barred from Creighton Court. The problem with that is in the Black decision, I believe, we had a similar thing going on. There was a group of people being detained, and the government relied in part on the fact that one of them, a gentleman named Gates, had a prior arrest history. What the court said in response to that is Mr. Gates' prior arrest history is not reasonable sufficient to stop him for suspicion of a crime, much less his cohort, who was Mr. Black. In terms of trespassing, there's a reference to apparently before the incident as an issue in this case, there was a 2011, pardon me, Officer Butler had looked at some materials and determined that the defendant had a 2011 arrest for trespassing. He also said he believed that his most recent address was not in Creighton Court. Again, I think there's a litany of cases that say a prior arrest alone is not sufficient, especially one that's an eight-year-old trespass violation involving a suspect who has repeatedly said, look, I'm not barred, you can call, you can check it out, and all of that. Of course, again, I've made my observation about sort of the mechanics of the trespass allegation, given the evidence that there's really no signs up, and certainly no signs specifically targeting sidewalks or roadways. There is some reliance on page 19 of the government brief on a police database of unknown origin from 2009 and 2011, which described the defendant as a gang member, a narcotics buyer or seller, and probably armed. As I think I indicated in my brief, that strikes me as sounding like the old partial records akin to caution data addressed by this court in the Powell decision, again saying that's insufficient standing alone to create reasonable suspicion. We also have cases like Sprinkle where, in that case, an officer recognized a person as recently released from prison, I believe on a drug offense, and he suspected the person of reoffending at that time. And again, the court said that's certainly not enough for reasonable suspicion. The other thing I would point out with respect to the armed issue is Butler, at Joint Appendix page 121, was asked, you had no reason to believe that he was armed that day, correct? This is proceeding, this is at the time of the stop, not the time of the takedown later. And his response was, that is correct. So again, I would urge the court not to rely on an articulated rationale that doesn't seem to be consistent with what the lead officer's testimony was. The government also relies on Butler's prior observations of armed dealers selling drugs in high-crime Creighton. Again, I think over and over and over again, this court, in cases like Black and certainly even Illinois v. Wardle, when the Supreme Court supports this concept and the Curry-Von Bonk decision last year, a high-crime area does not itself suffice for reasonable suspicion. Mr. Gill, isn't it true that Officer Butler stated his reason for what he was doing? He was investigating a trespass, nothing else. That's true, Your Honor, yes. And that sort of leads me to the last point that I think the government makes with respect to the issue of whether reasonable suspicion existed, was sort of a trilogy of claims related to the CI. One, that the CI indicated Peters was selling in a specific address. Two, he had provided reliable information in other cases. And three, that the stop occurred in front of the house the CI claimed the defendant was selling drugs from. Again, I think I understand articulating those as factors, but when one looks at the record, Officer Butler says on joint appendix page 118, he wasn't investigating Peters that day for possible drug trafficking. To your point, Judge Floyd, he didn't have enough information to believe whether Peters was engaging in drug trafficking in Creighton on that day. And other than what I think he described as a record management alert data from 2009, he had done no independent corroboration of the confidential informant's claims. In addition, the claims of what the confidential informant said do not indicate that the informant claimed the defendant was armed. In addition, there was no evidence that the confidential informant had been determined reliable as to the claimed illegality of Mr. Peters' actions. I will address briefly three cases the government relies on. I think I've addressed this fully in my briefs, but Bumpers, the 2013 decision of this case, involves essentially the prompt scattering of the defendant and a fellow loiterer on a clearly no-trespass-signed store parking lot upon seeing police. We have none of those factors here at all during the duration of this report. Judge, I think I see that my time is up. You see correctly. All right, I apologize, Judge. I'll be seated. Mr. Anthony? Good morning, judges. I am Stephan Anthony with the U.S. Attorney's Office. May it please the Court. Yes. Despite having information that Mr. Peters was unlawfully present in the Creighton Court area, that he had engaged in drug trafficking in the building where he was seen walking in front of, despite knowing that he was also with a nonresident who was also barred from the area, and despite knowing that Mr. Peters had a history of drug trafficking, what Officer Butler and Officer Cooper intended to do was engage in a consensual encounter with Mr. Peters and Mr. Garrison to inquire about why they were present in the Creighton Court area. And so they did that when they got out of their vehicles, and they asked both Mr. Garrison and Mr. Peters, basically, what are you doing here? As they both continued to walk, Mr. Peters and Mr. Garrison, the officers also asked them whether they would lift their shirts to show that they didn't have any weapons. Mr. Garrison did so. He raised his shirt, as you will see in the video, above his waist. I think he actually even exposed some of his skin at one point. And he continues to walk. Mr. Peters slightly raises his shirt, not above his waistband. And then he makes the choice to stop and talk to the officers. As they continue to ask, could you lift your shirt? At no point during that initial part of this encounter did either officer say, stop, come and talk to us, don't move, any sort of command to dictate to Mr. Peters that he should stop and talk to them, has to stay and talk to them, or otherwise make him conclude that he cannot freely go about his business. Indeed, Mr. Garrison, who was also being directed with the same questions, who was also facing the same questions from the officers, continued to walk and then left the area. They had no other encounter with the police, as far as we know, that day. So with that, judges, what I think we need to discuss, and I intend to discuss first, is why this was a consensual encounter between Mr. Peters and the officers, not the least of which is that a reasonable person, Mr. Garrison, found it possible and indeed did leave the area. Secondly, and the alternative, if the court does determine that this was indeed a Terry stop, one needing to be supported by reasonable suspicion, that there was indeed reasonable suspicion by Officer Butler that Mr. Peters and Mr. Garrison, for that matter, were trespassing, and that Mr. Peters, in fact, could be armed at the time that he was encountering the officers. But how old is that information? That arming thing occurred in a report that was 10 years old. And that he was trespassing, what information does he have currently? And what he does have is Peters saying, I've just been in my family's home. Yes, sir. There's a couple of things. One, I think, also requires me to address a question you posed to Mr. Geale, which was whether this trespassing investigation was only based upon trespassing after being banished. And I think that's incorrect. When the court looks at the Memorandum of Understanding, which is at Joint Appendix page 247, the officers are tasked with investigating any issue of potential trespassing where the person is a nonresident, is not accompanied by a resident, is not an employee, and may be there with no legitimate social purpose. So what we have with Officer Butler is not simply that he knows that there was a 2011 arrest, but trespassing, from which he concluded that Mr. Peters was barred. But we also know that he's not a resident there, at least as far as Officer Butler had information, the residence of Mr. Peters was in Mosby Court, which is not within Creighton Court. So he's not a resident. He certainly has no information that he's an employee. Then he also knows he's not being accompanied by a legal resident because he knows that Mr. Garrison is also barred. Wouldn't that be the same description of me going to Creighton Court? I don't live there. You have no information that I have any business. Wouldn't that be for me or anybody else? It could be judged at the threshold level, but I think the difference is, is all of the information Mr. Officer Butler knew about Mr. Peters beforehand. And that's 10 years old. No, it wasn't 10 years old, the fact that he was there with a non-resident and was not a resident. That was current information. But he was with someone who was not a resident? That's correct. That's the same. The person with me also is not a resident. Wouldn't that be in the same position? But again, I think the difference is, it's what the officer knew about Mr. Peters versus somebody else he had no idea about. So if there's someone in Creighton Court walking around that this officer does not know at all, then yes, it would be different for him to say, well, let me stop that person and inquire about whether they live here or whether they don't, whether they're with somebody who lives here or they're not, whether they have a legitimate social purpose. That's the Jones case. That's the case where the officer says, these are four black men in a vehicle I don't recognize. I don't know them, let me stop them. That's not the case here. What the case here is this is Anthony Peters and Gregory Garrison. These are two people that Officer Butler has encountered and knows. Officer Butler knows neither one of them live there. Officer knows that Mr. Peters at least has this prior arrest. Officer Butler knows that he has information from a confidential informant that Mr. Peters sells crack cocaine in Creighton Court. But that's not what he said. The whole stop was trespass. That's correct, Judge, but that also feeds the trespass question, right? If you're there in an area where I believe that you might also be selling drugs, I can also believe that you may not have a legitimate social purpose for being there. That's the problem. All those things you talk when you can believe about a person exists for the universe. That's the whole idea. You can't have a dragnet that's so broad that it gets a lot of people. You don't know anything about me. He would know about me. I'm walking there. Maybe I don't look like somebody who lives in Creighton Court. Why couldn't they say, well, you know, he doesn't look like he lives here. I don't see with anybody who's there. And if I'm sure. So then I would have to comply, right? No, sir. Why not? The point is, it's not that he doesn't know anything about Anthony Peter. Yes, he does not know anything about Judge Gregor. If Judge Gregor was in Creighton Court today, Officer Butler encountered you and obviously didn't know you were Judge Gregory. No, he wouldn't know anything about you. He wouldn't be able to just stop you randomly and say, would you lift your shirt? Because I'm investigating trespass. That's not the case with Mr. Peters. He knows Mr. Peters. He knows Mr. Peters has a drug trafficking issue. He knows Mr. Peters has his. No, he doesn't know that. There's nothing in this record that has validated any reliability on that CI at all in this record. That's that you can't make the record. What is not? It's just a, this is an allegation. There's no, nothing was done. That's undisputed in the record. The point is the drag that is so broad. And you said that this was just voluntary. Didn't they come out? Didn't they stop the car in the street? Yes, sir. They just stopped it right there. They came out and said, I mean, within 20 seconds, you know, you're trespassing. You should be, you know, I can arrest you. Does that sound like just a friendly conversation? Consensual to police officers flanking me, telling me, you know, I can arrest you for trespassing. It didn't debunk at him. What were they trying to do? Get him to provoke him to act like the, to what? To hit them or run or what? What was that for? Judge, there's a number of things you raised. I want to address. Yeah. Raise the trespass. That's what the only reason when this record said he stopped before. There's a number of things you raised. I would like to address first as a factual matter with respect to the officers getting out of the vehicle and within 30 seconds threatening to go to jail. That is not the case. What happens is Officer Butler gets out of the vehicle. He first addresses Mr. Garrison. He says, hey, GG. And then he says, you know, you're not supposed to be out here. Neither one of you is supposed to be out here. You're barred, right? So that is a suggestion or an implication that he thinks that they are trespassing. Yes, that is correct. But, again, we have to consider a reasonable person situation and what happens in this situation. In this situation, both of them continue to walk initially. Both of them continue to walk away even after the officer asks them, can you lift your shirt? Mr. Garrison not only continues to walk after lifting his shirt, he continues to walk out of the scene. He's gone. Mr. Peter stops and talks to the officers. That's why it's a consensual encounter. It's because Mr. Peter said, I'm going to stop and I'm going to talk to them. And as they're talking to him, yes, they keep asking him can he lift his shirt. But, again, if an officer is in a consensual encounter with you, he can ask whatever he wants, and at some point you can say I don't want to do that and continue to walk away. Mr. Peters never does that. He never takes the tack of Mr. Garrison. He stays there. The other thing the court mentioned is about the CI information and whether that was a reliable CI. No, it's different. He complied with what the police officer wanted. Then he walked away. Yes, sir. That's different. No, yeah. If the shirt up, then he walked away. That's a clear indication unless I do what you ask, I can't walk away like you did. So that's a distinction right there. I think the reason why that's not a distinction, Judge, and this is a point Mr. Gill brought up a couple times in his brief, he kept bringing up, well, they couldn't see the front of Mr. Garrison's shirt or the front of Mr. Garrison's pants either because he had walked past them by the time they asked him to lift his shirt, implicating that they were somehow focused on Mr. Peters. But if you look at it the correct way, I think you should look at it, despite the fact that they didn't see Mr. Garrison's shirt, the front of his shirt, he kept walking. And they didn't pursue him and say, oh, turn around, let me see the front. You didn't show me the front. They wouldn't have said the same thing to Mr. Peters, except Mr. Peters stopped and became evasive and he would lift it slightly or slightly a little more. And then they were like, well, can you lift it all the way up so we can see? That's why he kept getting the questions. Mr. Garrison stopped getting those questions, despite not showing the front of his pants, because he kept walking. This encounter started at 22.29.31 seconds. At 22.30.30, the officer says, so you want me to take you to jail. Within one minute. Where's the reasonable suspicion? The reasonable suspicion there, Judge, is that he is engaged in a trespassing violation. And, again, what the officers are tasked with, as we look back at the memorandum of understanding, is not just whether somebody had been barred and was back on the property. They also had the power and duty to investigate whether the person was a resident there, whether the person was with a resident there, whether the person was an employee there, or whether the person had some other legitimate purpose to be on the Creighton Court property. Once again, if I could go back, Judge Gregory, to the points you made about the C.I. and whether the C.I. was reliable. Yes, the record does reflect there was significant points as to why the C.I. was reliable, not the least of which is that the officer had relied on his information to make arrests. The officer had relied on his information to do controlled purchases. The officer had relied on his information that led to convictions. All of that is in the record, and all of that is what Officer Butler testified to. Now, with respect to the trespass itself, going back to Judge Floyd's question, with respect to the memorandum of understanding, all of those factors that the officer is investigating, all of them weigh against Mr. Peters at the time the officer made the contact with him. He was not a resident there. He was not accompanied by a resident there. In fact, he was accompanied by someone who was also barred. He was not believed to be an employee there. And then with respect to the legitimate social purpose, that's why we have to take into account what the C.I. brought up. Because what the C.I. said was the reason, or one of the things that Mr. Peters is doing while he's in Creighton Court, a place he doesn't live, a place where the officer thought he was barred, is he's selling crack cocaine. And he's selling crack cocaine in a particular building. And as the officer was coming upon Mr. Peters, Mr. Peters was almost nearly in front of the very building where the C.I. said, yeah, he sells crack out of that building. So that's the reason why he wouldn't have a legitimate social purpose, and that's why the officer got out to speak to him. Now, what the officer didn't do is say – Wait, I'm just saying, what you're saying, none of that's in the record, because the record says exactly what the reason was, was trespassing. Now, you're saying this, and I mean, it's a great jury argument, but it's not what the record is. Judge, the record does say that the officer – The record said the reason that he stopped him was to investigate trespassing. That's correct, Judge. And nothing about drugs or being at the same location where the C.I. said that he slings or that kind of thing. You're saying that, but that's not what he said. Because the testimony of Officer Butler specifically makes reference to the fact that the C.I. gave him information that the defendant was selling drugs out of a building, the building where he was stopped, right in front of. I know that. That's why we know that, because he said that that's what he had been told. But the question is why he was there and why he made this encounter with a citizen. That's the whole idea. The Fourth Amendment protects citizens. It's not about whether or not you judge the quality of the citizen or where they are or what they look like. The question is, he's there for trespass. Now, you said he was trespassing. Well, for the reasons I just listed under the memorandum of understanding, yes, he was trespassing. He was not there as a resident. He was not with a resident. He was not an employee. And again, what the point I'm trying to make, and if I could isolate this, with respect to that one issue of being there with a legitimate social purpose, that's the reason why the allegation of drug trafficking is so important. So I can't walk on the sidewalk of Creighton? Because I know the area very well. It's a sidewalk that abuts a public street. I can't walk on the sidewalk because I don't live in Creighton Court? Is that what you're telling the court? That is not what I'm telling the court. I didn't think so. He was on the sidewalk. What I'm telling the court, well, let me also address that in the record. If the court looks at the video, at the very outset, Mr. Peters is not on the sidewalk. Mr. Peters is on the grass. Mr. Garrison is on the sidewalk. So that's one distinction that's important. But beyond that, Judge, what the district court found, and I think it's a factual point at this stage, is what the district court found in a footnote, it mentions that the apartment complexes of the RRHA, the complexes are restricted areas where the memorandum of understanding applies. And if the court is familiar with Creighton Court and similar courts, Mosby Court, those courts, they have apartment buildings on either side of streets within the complex. So it's as if you're going, for lack of a better term, going into a subdivision. It is not simply driving down Broad Street and there are cars or houses on each side. This is a particular street within the complex where apartments are on each side and there's no trespassing in the complex. And so what the officers are enforcing is not simply somebody not belonging in a building or not belonging on the grass. What the officers are enforcing is somebody being in the complex that doesn't belong there. And, again, I think the distinction between somebody the officer has no idea about versus somebody the officer knows is what makes this case distinct. This court doesn't have to issue an opinion that anybody going into Creighton Court that is not known to the officer can be stopped. What we're saying is that somebody the officer knows and knows about and knows what he might be doing while he's there, that person can be investigated for trespass. And that's what the officer did here. When he confronted him, he had the information of a prior arrest, even if it wasn't a barment and it didn't result in a conviction, even if he was wrong about that. What he still had is that he's not a resident, he's not with a resident, he's not there as an employee, and he's not likely there for a reasonable, legitimate social purpose because we know, or I know as the officer, I have a reliable, confidential informant that tells me he sells crack out of that house, and he's in front of that house where he's supposed to be selling crack. That's not a legitimate social purpose. That's why this is an investigation that was proper for this office. Again, this is not Jones. Jones was four black men driving down the street, and the officer said, I don't know them, they must not belong. And then he proceeds to follow them from public property onto private property. And then he blocks them in. And then he goes straight to the one driver and says, lift your shirt. That's not the case here. There is no following. There's no blocking in. There is not following an unknown person onto private property from public property. And the officers didn't go any more towards Mr. Peters than they did towards Mr. Garrison. They went towards both of them with questions. The difference is one chose to stop Mr. Peters. Mr. Garrison chose to keep walking. There's no reason to believe that if Mr. Peters did that, that there would have been a chase, or otherwise the officers tried to stop him any more than they tried to stop Mr. Garrison. And insofar as Mr. Garrison is a reasonable person, or we can presume that he's a reasonable person, the reasonable person would have reason to believe that he could depart that encounter. Now, with respect to the reasonable suspicion that Mr. Peters was armed, we are not focusing on any single factor. What we have here, again, starting with what the officer knew beforehand and what he gleaned while he was encountering Mr. Garrison, excuse me, Mr. Peters. What he knew beforehand is that Mr. Peters had these alerts. And we don't have to put a lot of weight in those alerts because they are, in fact, both. But one thing to consider, that despite the age of those alerts, what the officer had is fairly contemporaneous information that corroborated those alerts. What was that contemporaneous information? The CI said, I know Anthony Peters is selling crack cocaine in Creighton Court out of the building where the officer saw him. Officer Butler specifically said that in his six years of experience being in Creighton Court, he knew that drug trafficking and armed drug trafficking was prevalent. And this court knows and has said many times that drug trafficking and guns go together. All of that informed him even before encountering Mr. Peters. And when he did encounter him, what he found was Mr. Peters – I see I'm out of time, Judge. You can go ahead and finish it. What he saw is Mr. Peters being very evasive in terms of wanting to lift his shirt. And so as the officer is keeping his eyes on a particular area of his body, once Mr. Peters finally lifts his shirt above his belt buckle, the officer says, that looks like a muzzle and you see the officer go in. So, Judge, for all these reasons, we ask that the court affirm the district court finding that there was reasonable suspicion to believe Mr. Peters was armed, finding that either he was engaged in a consensual encounter with Officer Butler or there was reasonable suspicion to detain him for the purposes of investigating trespass and other crimes. Thank you, Mr. Anthony. Mr. Gill, you have some time reserved. Judge, I think I'd address three points. One is the supposition that the officers intended a consensual encounter. I think one knows someone by their deeds, right, not by their words or intentions. You glean intentions from what they do. And what they do is they come on up, they stop quickly in the street, they get on out, and they immediately accuse Officer Butler in specific, immediately accuses both of being barred. So, again, that is, as this court has repeatedly said, that's not the typical voluntary police encounter that starts with, hey, how are you doing? Mind if I ask you some questions?  The second thing I'd say is with respect to the investigation of trespass, there really was, as far as I can tell on this record, no investigation of trespass after my client stopped and looked at the officers and had the dialogue he did. That is to say, Mr. Peters actually says, I am not barred, denies it, says, look it up. There's no effort to do that. There is no effort also, there is no questioning saying, who are you here to see? What's your business here? There's no suggestion like that. The other thing is I do go back on the third point to what the record was and Judge Hudson's concern that, I think a valid concern, that he really, whatever the memorandum of understanding says, he can't see on the many buildings displayed in the video any signage at all, much less any signage where he specifically asked Officer Butler about saying it's unlawful to even be on the roadway or the sidewalk. I think those are significant, and I think those deal with the government's reliance on those points. Thank you. Thank you, Mr. Gill and Ms. Anthony, for your presentations today. We'd love to come down and shake your hand, but we can't under the circumstances. But please know that we appreciate your being here, and we wish that you will be safe and stay well.
judges: Roger L. Gregory, Henry F. Floyd, William B. Traxler Jr.